[896 NE2d 69, 866 NYS2d 586]

In the Matter of Ronnie Ramroop, Appellant, v Flexo-Craft Printing, Inc., et al., Respondents. Workers' Compensation Board, Respondent.

Argued June 3, 2008; decided June 26, 2008

## POINTS OF COUNSEL

*Joel M. Gluck,* Brooklyn, for appellant. I. The decision of the Workers' Compensation Board affirmed by the Appellate Division is proscribed by Workers' Compensation Law § 17 and this state's historical refusal to bar compensation based on immigration status. (*Matter of LaCroix v Syracuse Exec. Air Serv., Inc.,* 8 NY3d 348; *Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451; *O'Rourke v Long,* 41 NY2d 219; *Noreen v Vogel & Bros.,* 231 NY 317; *Matter of Sackolwitz v Hamburg & Co.,* 295 NY 264; *Matter of Davison v Holder,* 137 AD2d 899; *Matter of Testa v Sorrento Rest.,* 10 AD2d 133; *Matter of Hernandez v Excel Recycling Corp.,* 31 AD3d 1091; *Matter of Richardson v Fiedler Roofing,* 112 AD2d 551, 67 NY2d 246; *Balbuena v IDR Realty LLC,* 6 NY3d 338.) II. The Workers' Compensation Board's decision rests on an erroneous interpretation of Workers' Compensation Law § 15 (3) (v). (*Matter of Fortuna v Pfizer, Inc.,* 91 AD2d 1083; *Matter of Landgrebe v County of Westchester,* 57 NY2d 1; *Matter of Porter v D.A. Collins Constr.,* 28 AD3d 951; *Matter of Marcera v Delco Prods., Div. of Gen. Motors Corp.,* 218 AD2d 888; *Matter of Graham v Pathways, Inc.,* 305 AD2d 830; *Matter of Bremner v New Venture Gear,* 31 AD3d 848; *Matter of Nye v IBM Corp.,* 2 AD3d 1164; *Matter of Carbonaro v Chinatown Sea Food,* 55 AD2d 756; *Matter of Scally v Ravena Coeymans Selkirk Cent. School Dist.,* 31 AD3d 836; *Matter of Lane v Rotodyne, Inc.,* 66 AD2d 153.)

*Gregory J. Allen, General Attorney, State Insurance Fund,* New York City (*Rudolph Rosa Di Sant* of counsel), for respondents. I. Denial of "additional compensation" under Workers' Compensation Law § 15 (3) (v) based upon treatment of claimant's illegal status as an additional impairment of his earning capacity is supported by the language of the statute, case law and the principles of statutory construction. (*Balbuena v IDR Realty LLC,* 6 NY3d 338; *Matter of Sackolwitz v Hamburg & Co.,* 295 NY 264; *Matter of Richardson v Fiedler Roofing,* 67 NY2d 246; *Matter of Howard v Wyman,* 28 NY2d 434; *Matter of*

*Tall Trees Constr. Corp. v Zoning Bd. of Appeals of Town of Huntington,* 97 NY2d 86; *Majewski v Broadalbin-Perth Cent. School Dist.,* 91 NY2d 577; *Meltzer v Koenigsberg,* 302 NY 523; *Patrolmen's Benevolent Assn. of City of N.Y. v City of New York,* 41 NY2d 205; *Matter of Porter v D.A. Collins Constr.,* 28 AD3d 951; *Matter of Graham v Pathways, Inc.,* 305 AD2d 830, 1 NY3d 564.) II. Denial of "additional compensation" under Workers' Compensation Law § 15 (3) (v) based upon claimant's ineligibility for vocational rehabilitation is supported by the language of the statute and is consistent with federal immigration policy. (*Matter of Murphy v Office of Vocational & Educ. Servs. for Individuals with Disabilities, N.Y. State Educ. Dept.,* 92 NY2d 477; *Hoffman Plastic Compounds, Inc. v NLRB,* 535 US 137; *Matter of Lane v Rotodyne, Inc.,* 66 AD2d 153; *Matter of Charles A. Field Delivery Serv. [Roberts],* 66 NY2d 516.) III. Workers' Compensation Law § 17 does not exempt immigration status from consideration in determining eligibility under Workers' Compensation Law § 15 (3) (v); alternatively, relief under Workers' Compensation Law § 15 (3) (v) is not unconditional. (*Matter of Fogorty v Young,* 1 AD2d 751; *Matter of Spaduccino v Hayes & Co.,* 180 App Div 37, 223 NY 681; *Matter of Testa v Sorrento Rest.,* 10 AD2d 133, 8 NY2d 705; *Matter of Iannone v Radory Constr. Corp.,* 285 App Div 751; *Matter of Kinkela v Crimmins Contr. Co.,* 263 App Div 770; *Matter of Serrano v M. A. Gammino Constr. Co.,* 281 App Div 736; *Matter of Rolle v General Foods Corp., Birds Eye Div.,* 19 AD2d 188; *AP Propane v Sperbeck,* 157 AD2d 27, 77 NY2d 886; *Williamson v 16 W. 57th St. Co.,* 256 AD2d 507.)

*MFY Legal Services, Inc.,* New York City (*Anne Marie O'Donovan* and *Jeanette Zelhof* of counsel), for Sameer M. Ashar and others, amici curiae. I. The history of New York's Workers' Compensation Law demonstrates the Legislature's powerful commitment to protecting all workers, irrespective of immigration status. (*Shanahan v Monarch Eng'g Co.,* 219 NY 469; *Matter of Post v Burger & Gohlke,* 216 NY 544; *Ives v South Buffalo Ry. Co.,* 201 NY 271; *Matter of Spaduccino v Hayes & Co.,* 180 App Div 37, 223 NY 681.) II. The term immigrants in Workers' Compensation Law § 17 is best understood as including undocumented immigrants given the Legislature's deep familiarity with immigration status distinctions and its intent that coverage under the Workers' Compensation Law be broad and exclusive. (*Shanahan v Monarch Eng'g Co.,* 219 NY 469; *Sliosberg v New York Life Ins. Co.,* 244 NY 482; *Alfson v Bush Co. [Ltd.],* 182 NY 393; *Noreen v Vogel & Bros.,* 231 NY 317.) III.

The Legislature, by adding Workers' Compensation Law § 15 (3) (v) in 1970, intended to strengthen protections for injured immigrant workers and did not exclude workers based on immigration status. (*Matter of Testa v Sorrento Rest.*, 10 AD2d 133.) IV. The Legislature's decision to expand workers' compensation coverage for injured immigrant workers in the 1980s makes even more explicit its commitment to protecting all workers, irrespective of immigration status.

*Urban Justice Center*, New York City (*E. Tammy Kim* of counsel), and *Legal Aid Society* (*Steven Banks, Adriene Holder, Richard E. Blum, Christopher Lamb* and *Hollis V. Pfitsch* of counsel), for New York City Central Labor Council, AFL-CIO and others, amici curiae. I. This Court has already held that it is the law and policy of the State of New York to protect all workers by providing wage replacement to injured workers regardless of immigration status. (*Balbuena v IDR Realty LLC,* 6 NY3d 338; *Hoffman Plastic Compounds, Inc. v NLRB*, 535 US 137; *Madeira v Affordable Hous. Found., Inc.,* 469 F3d 219.) II. New York's Worker's Compensation Law enshrines the same principles that this Court articulated in *Balbuena v IDR Realty LLC* (6 NY3d 338 [2006]) and therefore requires that workers' compensation benefits be equally available to all regardless of immigration status. (*Matter of Sackolwitz v Hamburg & Co.,* 295 NY 264; *Matter of Post v Burger & Gohlke,* 216 NY 544; *Matter of Testa v Sorrento Rest.,* 10 AD2d 133; *Matter of Richardson v Commissioner of N.Y. City Dept. of Social Servs.,* 88 NY2d 35; *Matter of Charles A. Field Delivery Serv. [Roberts],* 66 NY2d 516; *Gardebring v Jenkins,* 485 US 415; *Matter of Paolucci v Capital Newspapers,* 197 AD2d 811; *Matter of Caldas v 86 Alda Rest.,* 167 AD2d 594; *Matter of Fogorty v Young,* 1 AD2d 751.) III. As the Workers' Compensation Board's decision is not entitled to deference, the Court should make its own determination of the meaning of Workers' Compensation Law § 15 (3) (v) and reverse the Third Department's ruling. (*Matter of De Mayo v Rensselaer Polytech Inst.,* 74 NY2d 459; *Matter of LaCroix v Syracuse Exec. Air Serv., Inc.,* 8 NY3d 348; *O'Rourke v Long,* 41 NY2d 219; *Noreen v Vogel & Bros.,* 231 NY 317; *Matter of Davison v Holder,* 137 AD2d 899; *Matter of Smith v Tompkins County Courthouse,* 60 NY2d 939; *Matter of Porter v D.A. Collins Constr.,* 28 AD3d 951; *Matter of Eimers v Lee's Rest.,* 162 AD2d 850; *Matter of Marcera v Delco Prods., Div. of Gen. Motors Corp.,* 218 AD2d 888; *Matter of Graham v Pathways, Inc.,* 305 AD2d 830.) IV. The Court should reject the Workers' Compensation Board's determination because it is an unreasoned departure from the

Board's own decisions on the meaning of Workers' Compensation Law § 15 (3) (v)'s "due solely thereto" requirement.. (*Matter of Richardson v Commissioner of N.Y. City Dept. of Social Servs.,* 88 NY2d 35; *Matter of Marcera v Delco Prods., Div. of Gen. Motors Corp.,* 218 AD2d 888.) V. The Workers' Compensation Board erred in concluding that appellant did not meet the vocational rehabilitation requirement of Workers' Compensation Law § 15 (3) (v). (*Matter of American Tel. & Tel. Co. v State Tax Commn.,* 61 NY2d 393; *Matter of Lane v Rotodyne, Inc.,* 66 AD2d 153; *Madeira v Affordable Hous. Found., Inc.,* 469 F3d 219.) VI. The policies of workers' compensation and federal immigration law compel reversal of the Third Department's ruling. (*Matter of Jensen v Southern Pac. Co.,* 215 NY 514, 244 US 205; *Balbuena v IDR Realty LLC,* 6 NY3d 338; *Commercial Cleaning Servs., L.L.C. v Colin Serv. Sys., Inc.,* 271 F3d 374.)

**OPINION OF THE COURT**

Jones, J.

The question before us is whether claimant may recover "additional compensation" under Workers' Compensation Law § 15 (3) (v). We conclude that he may not.[1]

On March 28, 1995, claimant, then employed and working as a printer for respondent Flexo-Craft Printing, Inc., sustained a severe crush injury involving four fingers when he caught his right hand in a printing press.[2] After claimant's March 8, 1996 workers' compensation hearing (where his claim for a compensable injury to the right hand was established), the Workers'

---

1. Enacted in 1913 as Workmen's Compensation Law § 15 (*see* L 1913, ch 816), the statute provides compensation for four different types of injury: permanent total disability, temporary total disability, permanent partial disability and temporary partial disability (*see Matter of LaCroix v Syracuse Exec. Air Serv., Inc.,* 8 NY3d 348, 353 [2007], citing Workers' Compensation Law § 15 [1], [2], [3], [5]). "Permanent partial disability . . . is called a schedule loss of use award because the statute assigns—as by a 'schedule'—a fixed number of lost weeks' compensation according to the bodily member injured" (*LaCroix,* 8 NY3d at 353, citing Workers' Compensation Law § 15 [3]). As claimant here injured his hand, the number of weeks assigned by statute is 244 (*see* Workers' Compensation Law § 15 [3] [c]). Schedule loss of use awards "compensate for loss of earning power" and, like all other compensation awards, "are intended to provide a limited and certain, not full but uncertain remedy regardless of the fault of the employer, and to continue the wage income as nearly uniform as the provisions of the law would permit after the employee's injury" (*LaCroix,* 8 NY3d at 353 [citations and internal quotation marks omitted]).

2. Claimant underwent seven surgical procedures. His right third and fourth fingers were so severely injured that they required amputation.

Compensation Board awarded claimant temporary disability benefits that were paid by respondent employer's workers' compensation carrier, the State Insurance Fund (Fund). The Board ultimately ordered a 75% schedule loss of use award. In sum, under the Board's awards, claimant received primary compensation benefits from March 29, 1995 until January 18, 2000, when the award was fully paid. Claimant's case was subsequently closed.

In 1997, claimant was interviewed and evaluated by the Board's Rehabilitation Bureau for vocational purposes. Claimant was eventually referred to the New York State Education Department's Office of Vocational and Educational Services for Individuals with Disabilities (VESID), but the agency found that he was ineligible for services because he is an undocumented alien who cannot be legally employed in the United States.

In July 2002, more than two years after the schedule award had been fully paid, claimant requested that the case be reopened and restored, and that he receive "additional compensation" pursuant to Workers' Compensation Law § 15 (3) (v). After a hearing in October 2003, a Workers' Compensation Law Judge (WCLJ) awarded claimant section 15 (3) (v) benefits in the amount of $200 per week from September 2002 through October 2003 and ordered the Fund to make such payments. The Fund appealed the decision to a Board panel based on VESID's finding that claimant was ineligible for training for non-work-related reasons. A Board panel rescinded the WCLJ's decision and ordered further hearings regarding whether claimant's impairment of earning capacity was due "solely" to his work-related injury, as required by section 15 (3) (v). At a subsequent hearing held in September 2004, the Board's rehabilitation counselor testified that claimant was ineligible for VESID training due to his undocumented status. The WCLJ reinstated the additional compensation award and the carrier appealed the decision to a Board panel.

In November 2005, the Board panel that originally rescinded the WCLJ's first decision reversed the decision rendered at the subsequent hearing. The Board panel concluded that claimant did not meet the requirements of section 15 (3) (v) and that Workers' Compensation Law § 17 should not change this result. Claimant appealed to the Appellate Division, which affirmed. The court held that "the Board quite properly found that because claimant was an undocumented alien, he was ineligible

for employment in the United States and, thus, his loss of earning capacity was not solely attributable to his compensable injury" and that "Workers' Compensation Law § 17 [did] not compel a contrary result" (41 AD3d 1055 [2007]). We granted claimant leave to appeal and now affirm, albeit on different grounds.

Claimant and *amici* seek reversal of the Appellate Division order and argue, among other things, that the decision of the Board, affirmed by the Appellate Division, runs counter to the legislative history of Workers' Compensation Law § 15 (3) (v) and § 17. We disagree.

Because this appeal involves a question of statutory interpretation, we must discern and give effect to the Legislature's intent:

> "As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof. . . . In construing statutes, it is a well-established rule that resort must be had to the natural signification of the words employed, and if they have a definite meaning, which involves no absurdity or contradiction, there is no room for construction and courts have no right to add to or take away from that meaning" (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998] [citations and internal quotation marks omitted]).

Section 15 (3) (v) (added by L 1970, ch 286, § 1), entitled "Additional compensation for impairment of wage earning capacity in certain permanent partial disabilities," states, in relevant part:

> "[A]dditional compensation shall be payable for impairment of wage earning capacity for any period after the termination of an award under paragraphs a, b, c, or d[ ] of this subdivision for the loss or loss of use of [50%] or more of a[n arm, leg, hand or foot], *provided such impairment of earning capacity shall be due solely thereto. . . . As soon as practicable after the injury, the worker shall be required to participate in a board approved rehabilitation program; or shall have demonstrated cooperation with efforts to institute such a board approved*

*program and shall have been determined by the board not to be a feasible candidate for rehabilitation.*" (Emphasis added.)

Contrary to claimant's argument that the legislative history of section 15 (3) (v) controls, the statute clearly and unambiguously provides that claimant must fulfill two requirements. With this in mind and assuming, without deciding, claimant can establish that the impairment of his wage-earning capacity is due solely to the compensable injury he sustained, we hold that he does not meet the second requirement under the statute. That is, because claimant was ineligible for work in the United States, claimant did not, and could not, participate in a "board approved rehabilitation program." Moreover, even if we assume that claimant cooperated to the extent he could, his inability to participate was not because rehabilitation was not feasible—the Board never made a feasibility determination—but because no rehabilitation program is available to those who are not legally employable.

This appeal puts into clear focus the tension between the statute's vocational rehabilitation objective to return an injured worker to the marketplace, and the reemployment of a worker, as in this case, who is not authorized to so participate in the first instance. Section 15 (3) (v)'s legislative history underscores this tension:

"A key feature of the bill [that became section 15 (3) (v)] is the requirement that the worker receiving additional compensation participate in Board approved programs of retraining and rehabilitation. This helps both the worker and the employer since it will tend to reduce the effects of the injury, *restore the worker to re-employment* and help him achieve his optimum earning capacity" (Governor's Program Bill Mem, Bill Jacket, L 1970, ch 286 [emphasis added]).

Simply put, it cannot have been the Legislature's goal to "restore . . . to re-employment" a worker who may not be lawfully employed. Reversal of the Appellate Division order would not only promote such restoration, it would effectively place the instant claimant, and others similarly situated, in a more favorable position than claimants who must meet all statutory requirements. This would amount to our directing the Board to put its imprimatur on an "additional compensation" award in contravention of its statutory mandate, a result which the law compels against.

Additionally, claimant's reliance on section 17 is misplaced. Section 17, as amended in 1985 (*see* L 1985, ch 538), provides, in pertinent part, that "[c]ompensation . . . *to aliens not residents or about to become nonresidents of the United States or Canada*, shall be the same in amount as provided for residents" (emphasis added). By its plain terms, section 17 is concerned solely with the treatment of aliens (not just undocumented aliens) who reside, or are about to reside, somewhere other than the United States or Canada. Under section 17, as originally enacted, the Board had the authority to commute in half all death and disability compensation awarded to such aliens; thus, such aliens were paid only half of the compensation they would have otherwise received. This practice was eliminated when the Legislature amended section 17 in 1985. This amendment was intended to "delete[ ] the provision from the Workers' Compensation Law which provides that upon an alien becoming a non-resident alien, the benefits to which he is entitled under the Workers' Compensation Law are reduced by 50%" and "restore the amount of compensation paid to non-resident aliens to 100%" (Sponsor's Mem, Bill Jacket, L 1985, ch 538). Put differently, section 17, as amended, is meant to ensure that an alien's relocation outside the country (or Canada) will not result in diminished "compensation" to that alien. Based on the legislative purpose of section 17 and because claimant, according to the record, resides in New York State, section 17 is inapplicable here.

Although some workplace protections[3] and primary workers' compensation benefits[4] have been held to be available to injured workers who cannot demonstrate legal immigration status, the terms of section 15 (3) (v) are clear and we are constrained to give effect to their plain meaning.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

CIPARICK, J. (dissenting in part). I agree with the majority that section 17 of the Workers' Compensation Law is not applicable to the facts of this case. However, because the record fails

---

**3.** *See e.g. Balbuena v IDR Realty LLC*, 6 NY3d 338 (2006) (holding that our state Labor Law protections are not preempted by the federal Immigration Reform and Control Act of 1986 [8 USC § 1324a *et seq.*], which is designed to deter the employment of aliens who are not lawfully present in the United States and those who are lawfully present, but not authorized to work).

**4.** *See e.g. Matter of Testa v Sorrento Rest.*, 10 AD2d 133 (3d Dept 1960), *lv denied* 8 NY2d 705 (1960).

to establish whether a Workers' Compensation Board approved rehabilitation program is available to those persons who are not legally employable, I respectfully dissent.

The majority today holds that the claimant's "inability to participate was not because rehabilitation was not feasible—the Board never made a feasibility determination—but because no rehabilitation program is available to those who are not legally employable" (majority op at 167). The record reveals otherwise. At an October 25, 2005 hearing before the Workers' Compensation Board, Commissioner Mona Bargnesi asked whether there was a rehabilitation service that did not require the participant to have a green card. Neither Mr. Hilfer (counsel for Mr. Ramroop) nor Mr. Zenkewich (counsel for Flexo-Craft Printing and the State Insurance Fund) knew whether such a program was available. Indeed respondents' counsel replied:

> "He went where they generally send them. They sent him to the VESID program . . .

> "Well, I would think that . . . since it has to be a Board approved program that if there was another program that he could have done. I—Personally, I would have hoped that the VESID people could say we can't handle you because of your status but you should go someplace else if there was another place, so I don't know" (Oct. 25, 2005 hearing held before State of New York Workers' Compensation Board, transcript at 14).

Because the question of whether there exists a Workers' Compensation Board approved rehabilitation program willing to enroll a person with an immigration status impairment has not been answered, I would reverse the order of the Appellate Division and remit for further proceedings to determine the availability of an alternative program.

All workers, whether or not they are authorized to work in this country, are eligible for workers' compensation benefits as such benefits are available.

> "To further the claimant's ability to establish his [or her] right to benefits, the statute creates a presumption that the injuries are compensable. The statute was enacted for humanitarian purposes, framed, in the words of Chief Judge Cardozo, to insure that injured employees might be saved from becoming one of the derelicts of society, a fragment

of human wreckage. To further that purpose, we have held that the statutory obligation to compensate injuries sustained in the course of employment which are causally related to it does not depend on the equities of a particular case, nor may it be avoided because of the workers' fraud or wrongdoing: it is absolute" (*Matter of Richardson v Fiedler Roofing*, 67 NY2d 246, 251 [1986] [citations and internal quotation marks omitted]).

Furthermore, I cannot agree with the majority's conclusion that

"it cannot have been the Legislature's goal to restore to reemployment a worker who may not be lawfully employed. Reversal of the Appellate Division order would not only promote such restoration, it would effectively place the instant claimant, and others similarly situated, in a more favorable position than claimants who must meet all statutory requirements" (majority op at 167 [ellipsis and internal quotation marks omitted]).

The legislative history of Workers' Compensation Law § 15 (3) (v) demonstrates that only health-related restrictions on eligibility were contemplated. This intent is articulated in the Governor's program bill memorandum which notes that compensation is available "if the worker continues to suffer loss of earnings because of the injury" (Governor's Program Bill Mem, Bill Jacket, L 1970, ch 286, at 2). Nowhere within the legislative history does it state that in order to qualify the worker must be legally authorized to work within the United States. What is stated is that the purpose of the bill is "[t]o provide additional compensation benefits to certain workers suffering impairment of earning capacity because of a job-connected loss of an arm, hand, leg, or foot" (*id.*).

Section 15 (3) (v) of the Workers' Compensation Law has two requirements: (1) that the worker suffer an injury involving 50% or more loss, or loss of use of an arm, hand, leg or foot; and (2) that the worker participate in a retraining and rehabilitation program approved by the Workers' Compensation Board or cooperate with such efforts and be deemed not to be a feasible candidate. Here, claimant has suffered a 75% loss to his right hand. However, this record is devoid as to whether there exists an alternative rehabilitation program approved by the Workers' Compensation Board that could provide the necessary services

to help this claimant to return to the workplace or to determine that rehabilitation is not feasible, as the Workers' Compensation Law intended.

Providing claimant, and others similarly situated, with additional compensation will not effectively place them in a more favorable position than claimants who must meet all statutory requirements because it has yet to be established that VESID is the only rehabilitation program approved by the Workers' Compensation Board. As stated by Workers' Compensation Board Commissioner Michael Berns during the October 25, 2005 hearing:

> "I have a suspicion . . . that everybody is hanging on the letter of the law here. In the meantime, we have a claimant who may have other alternatives. We don't know because the State Insurance Fund is not doing anything . . . In the meantime, the claimant has not been given any alternatives for service how he could conceivably get back into the workplace" (transcript at 13).

As we stated in *Matter of Smith v Tompkins County Courthouse*, it is a "fundamental principle that the Workers' Compensation Law is to be liberally construed to accomplish the economic and humanitarian objects of the act" (60 NY2d 939, 941 [1983]). The purpose of section 15 (3) (v) is to reemploy the worker and maximize the worker's earning capacity (*see* Governor's Program Bill Mem, Bill Jacket, L 1970, ch 286, at 3). For this Court to now hold that a worker's earning capacity is diminished because of a lack of authorization to work in this country—when the lack of authorization existed preinjury—defeats this legislative purpose.

The majority today forecloses the availability of additional compensation for severely injured workers solely because they may lack permanent residency status or authorization to work in this country, ignoring the history of our Workers' Compensation Law and this State's commitment to protect all workers, irrespective of immigration status (*see Balbuena v IDR Realty LLC*, 6 NY3d 338, 358-359 [2006]).

Therefore, I would reverse the order of the Appellate Division and remit to the Workers' Compensation Board for a hearing in order to establish whether there exists such an alternative rehabilitation program.

Judges GRAFFEO, READ, SMITH and PIGOTT concur with Judge JONES; Judge CIPARICK dissents and votes to reverse in a separate opinion in which Chief Judge KAYE concurs.

Order affirmed, with costs.